### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRUNG DE SA, | : | |
| | : | |
| *Plaintiff,* | : | Civil Action No.:  2:21-cv-1563 |
| | : | |
| v. | : | |
| | : | |
| EQUITRANS MIDSTREAM CORP., | : | |
| | : | |
| *Defendant.* | : | |

## COMPLAINT

AND NOW, comes the Plaintiff, Trung De Sa, by and through his undersigned counsel, Sean A. Casey, Esquire, and files the following Complaint:

### Nature of the Action

This is an action brought for racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1) and the Pennsylvania Human Relations Act (PHRA), and for creation of a hostile work environment. The Plaintiff, Trung De Sa, seeks declaratory, injunctive and compensatory relief for the discriminatory conduct, retaliation, and hostile work environment he has endured by the Defendant in this matter.

### Parties

1.     Plaintiff, Trung De Sa, is an Asian, male individual, currently residing at 642 Concerto Lane, Silver Springs, Maryland 20901, and previously had resided at 426 E. Wheeling Street, Washington, Pennsylvania 15301.

2.    At all times relevant hereto, the Plaintiff, was a qualified individual, and otherwise possessed of all qualifications necessary to perform the essential functions of the job.

3.    Defendant Equitrans Midstream, Corp., (hereinafter "Equitrans") is an employer within the meaning of the Act, with their headquarters located at 2200 Energy Drive, Canonsburg, Pennsylvania 15317, and employs in excess of five hundred (500) employees.

### Jurisdiction and Venue

4.    This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §1331, relating to federal questions. Supplemental jurisdiction over the related state law claims is conferred by 28 U.S.C. §1367(a).

5.    This action arises in part under 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991, and 42 U.S.C.A.

6.    This action also arises under the Civil Rights Act 42 U.S.C. for the violation of Plaintiff's constitutional rights by Defendant.

7.    Venue is proper in this case pursuant to 28 U.S.C. §1391(b).

### Factual Background

8.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

9.    The Plaintiff, Trung De Sa, is an Asian male individual, approximately thirty-two (32) years of age.

10.    The Plaintiff is employed by the Defendant as an engineer I, with a current base salary of $94,500.

11.     The Plaintiff was initially hired with EQT in May of 2015, and subsequently reassigned with Equitrans Midstream during a corporate restructuring.

12.     The Plaintiff primarily worked remotely performing his job duties, while at the time living in Washington, Pennsylvania, and reported to the headquarters office.

13.     The Plaintiff married and moved to his current address in Silver Spring, Maryland, and he remains reporting to the headquarters office at 2200 Energy Drive, Canonsburg, Pennsylvania 15317.

14.     As noted above, the Plaintiff began his employment in May of 2015, and up until November of 2020, he had received nothing but favorable work reviews, and had never received any type of verbal or written discipline of any kind.

15.     It is important to note, one of the main objective measures of an engineer's performance with the Defendant is the Issued for Construction (IFC) dates for pipeline drawings, and in the last two (2) years prior to filing his EEOC Charge, the Plaintiff had been early or on time with all thirteen (13) packages assigned to him.

16.     In or around April of 2019, as part of the EQT and Equitrans restructuring, the Plaintiff came under the management of a Jason Anderson, and he was the only minority under Mr. Anderson.

17.     The Plaintiff was advised on April 24, 2019, that Mr. Anderson was his new manager.

18.     After not having heard from Mr. Anderson for almost a week, on or about May 1, 2019, the Plaintiff took it upon himself to walk over to Mr. Anderson's desk and set up a meeting to discuss his background and the projects he was currently working on.

19.     The Plaintiff was very confused on why his new manager had not contacted him earlier concerning these issues.

20.     Eventually when the meeting occurred, Mr. Anderson seemed surprised at the Plaintiff's breathe of experience and current workload, yet nevertheless, throughout the next year while working under Mr. Anderson, the Plaintiff was only given a very narrow scope of cases, mainly involving water projects.

21.     On at least one occasion, in January of 2020, a project manager named Timothy Whitman specifically asked that the Plaintiff be assigned to his projects, with the Plaintiff acknowledging that he had the time to engage in the projects.

22.     Mr. Anderson denied the request and assigned a white engineer named Jeremy Watts instead to the projects, with no real explanation as to the reason.

23.     Mr. Anderson's discriminatory actions included the lack of assignments being given to the Plaintiff that were certainly in his area of specialty, namely gas pipelines.

24.     Specifically in February of 2020, when project manager Timothy Whitman went to Mr. Anderson's desk multiple times and requested that gas line projects be assigned to the Plaintiff, but all of those requests were ignored.

25.     Instead, Mr. Anderson assigned all of those pipeline projects to white engineers in the group.

26.     In fact, when a document listing the pipeline projects for 2020 and the engineers assigned came out, the Plaintiff was only assigned one project, whereas an engineering intern, that is a white male, in the department named Ryan Modzelewski had more plan projects assigned to him than the Plaintiff.

27.     Instead of offering some explanation for this lack of assignments provided to the Plaintiff, Mr. Anderson again refused to discuss anything in those terms, and on the occasions he did give the Plaintiff assignments, it usually came with some sort of innuendo that the Plaintiff was a last resort.

28.     Throughout the Plaintiff's employment under management of Mr. Anderson, there has been very little communication and/or discussion about work or promotions.

29.     Mr. Anderson has continually and regularly failed to engage in direct communication with the Plaintiff.

30.     On one series of projects, Mr. Anderson chose to communicate with a white male engineer named Matt Jarrett instead of the Plaintiff directly.

31.     This pattern of behavior by Mr. Anderson was picked up on by other members of the engineering group, leading them to make comments referring to the Plaintiff as "Matt's intern," "Matt's assistant," and in the more extreme "Matt's bitch."

32.     It should be noted here that the Plaintiff has more industry experience than any other engineer I within the company.

33.     Mr. Anderson also intentionally communicated with an engineer named Matt Jarrett during meetings or regarding projects there were actually assigned to the Plaintiff, instead of directly communicating with the Plaintiff.

34.     In the spring and summer of 2019, there were two water pipeline projects solely assigned to the Plaintiff, in which Mr. Anderson did not communicate with the Plaintiff for status updates, but rather ran all communications through Mr. Jarrett.

35.     During May of 2019 through August of 2019, the Plaintiff was leading the produced water technical work for materials analysis, for which he unfortunately had to find out multiple

times from his peers that Mr. Anderson was hosting meetings with a third party without him being notified or included in said meetings.

36.    On two separate occasions the Plaintiff was forwarded invites from his peers because he was not included in meetings or discussions being held by Mr. Anderson on the projects.

37.    During September of 2019 through August of 2020, the Plaintiff was co-assigned to a series of water measurement projects, again, for which Mr. Anderson communicated through Mr. Jarrett exclusively for the project status updates.

38.    In August of 2020, the Plaintiff was assigned to supervise pipeline fuses on a water project, but only after Mr. Anderson had exhausted all other options, which point was made known to the Plaintiff by Mr. Anderson.

39.    Mr. Anderson also had publicly acknowledged his lack of communication and lack of attempting to communicate with the Plaintiff during a weekly meeting that occurred in August of 2020, wherein Mr. Anderson stated, "I don't know why, but I always seem to miss Trung's one on one calls."

40.    In fact, Mr. Anderson had missed roughly half of the scheduled calls with the Plaintiff from April of 2020 through August of 2020.

41.    On November 6, 2020, the Plaintiff was unexpectedly contacted by a David Bellone of human resources and was advised that he was being suspended pending investigation.

42.    On November 4th and 5th of 2020, the Plaintiff had not immediately responded to Skype instant messages on his computer or emails from Mr. Anderson, which the Plaintiff later explained was due to personal issues he was having concerning his mental health and found it

necessary to take unscheduled personal days, for which he offered his apologies for not advising of sooner.

43.     Nevertheless, the Plaintiff was suspended pending an investigation, and said investigation lasted approximately a week.

44.     At the end of the suspension the Plaintiff was put on a final warning, which would be the most severe form of discipline available next to termination.

45.     The Plaintiff is unaware of anyone else being disciplined in such a harsh manner for taking unscheduled personal days prior to his incident.

46.     Regarding the Plaintiff's treatment of mental health issues, he did take advantage of some mental health services that were provided through human resources and UPMC.

47.     The Plaintiff does not believe that the failure to immediately advise his supervisor of the need to take the time off was in violation of any Equitrans policy that he is aware of, and that his behavior was not unusual for a group of design engineers working remotely and sometimes in the field.

48.     The Plaintiff maintains that a number of white engineers have engaged in the same or similar conduct and have not been disciplined for it.

49.     In particular, a white engineer named Jeremy Watts, had somewhat frequently been absent or nonresponsive, and to the Plaintiff's understanding had not received anywhere to this level of scrutiny or discipline.

50.     Mr. Watts was known for repeatedly being given chances despite his lack of quality work, failure to work scheduled hours, and even at times failure to show up for scheduled meetings.

51.     Once again, between March of 2020 and August of 2020, Mr. Anderson missed roughly one half of all scheduled meetings with the Plaintiff and with no explanations.

52.     There exists a great disparity in a number of minorities in the engineering department, as well as a significant difference in how those minorities are treated.

53.     Currently there are approximately thirty-eight (38) engineers at Equitrans Midstream that do design work, and only three (3) of those engineers are minorities and none had been promoted at the time (after Plaintiff's complaint, one ethnic minority was promoted to engineer II in February of 2021).

54.     During the Plaintiff's employment, while the three (3) minorities had not been promoted (after Plaintiff's complaint, one ethnic minority was promoted in February 2021), there have been at least seventeen (17) white engineers that have been promoted in the same time frame.

55.     It should also be noted that two (2) of the last three (3) terminations within that department were minority employees.

56.     The Plaintiff maintains that there is a significant, demonstrable disparity in the treatment of minority design engineers within Equitrans.

57.     In the Plaintiff's case, not only in the failure to promote him, the lack of communication, but also in the extreme discipline being taken against him for essentially taking personal days.

58.     In fact, the Plaintiff remained the only design engineer I with his level of experience that had not received a promotion during his time with the company.

59.     On or about January 5, 2021, the Plaintiff filed a Charge with the EEOC reporting racial discrimination and the creation of a hostile work environment by the Defendant.

60.     After the initial EEOC filing the Plaintiff experienced significant retaliation taken by the Defendant that led him to eventually file an Amendment to his Charge to include retaliation.

61.     Most notably, the Plaintiff had received his annual review, which was the most critical review that the Plaintiff had received during his entire employment with the Defendant.

62.     There were a number of categories within the performance review portion of the annual review that were inaccurate, if not fabricated.

63.     Specifically, in the category of collaboration, Mr. Anderson indicated that, "when a controversial issue is discussed with Trung, he will sometimes react in a confrontational way. I would like Trung to focus on maintaining his composure in these types of situations."

64.     The Plaintiff categorically denies any such allegation, or that he behaves in anything but a professional manner.

65.     More to the point, as noted above, Mr. Anderson has repeatedly gone out of his way to avoid direct communication with the Plaintiff, so it is unclear as to what he is basing his allegation on.

66.     At no time prior to this annual review had Mr. Anderson ever raised any such concerns to the Plaintiff either verbally or in writing since the time he became a direct report in April of 2019.

67.     Nor has the Plaintiff ever received any remotely similar comments from other managers from beginning work with the company in 2015.

68.     Further, nothing similar to the above noted allegation has not been found in any prior performance reviews, and it is the Plaintiff's belief that Mr. Anderson made this fabrication directly in retaliation for the Plaintiff's filing of the EEOC Charge.

69.     Possibly even a more obvious act of retaliation and inexplicable rating is that of the category of excellence on the annual review, as Mr. Anderson noted the Plaintiff as "below expectations."

70.     In the Plaintiff's annual review in 2019 year for the same category, the Claimant was rated as "exceeds expectations."

71.     Nevertheless, his rating for work completed during 2020 was "below expectations", a two-level drop in the performance review, which was completely contradictory to the factual reality of the Plaintiff's work performance.

72.     The Plaintiff's work during the year included him in fact completing all six (6) of his IFC packages on or before the baseline date, in addition to completing other capital maintenance projects, and it is the Plaintiff's belief at the very least he should have met the category in the schedule criterion for "exceeds expectations", as was his designation in the year before with arguably a less impressive performance.

73.     In the annual review, Mr. Anderson references a lack of communication by the Plaintiff, which is again incredibly ironic given the extreme avoidance referenced by the Plaintiff first in his initial EEOC Charge, and how Mr. Anderson had chosen to work through others, even in projects directly assigned to the Plaintiff.

74.     Another example of Mr. Anderson's retaliatory conduct is the fabrication of the vague questioning of the Plaintiff's reliability in the annual review, especially given that the Plaintiff not only completed all IFC projects by deadline, but has completed all of his IFC projects on time or earlier since working for Mr. Anderson in 2019.

75.     In fact, since the Plaintiff has never missed an IFC deadline and maintains a high quality of work, of which he has been praised for on numerous occasions prior to filing the initial EEOC Charge.

76.     An additional area in the annual review that was grossly exaggerated by the Defendant is the area of integrity.

77.    Mr. Anderson indicates in the review that the Plaintiff was unreachable for over a week in October of 2020, when in actuality the Plaintiff was only unavailable for two days due to the necessity of using two unscheduled personal days.

78.    The Plaintiff had explained that he in fact worked Thursday, October 29, 2020 and Friday, October 30, 2020, then subsequently worked Monday, November 2, 2020 and Tuesday, November 3, 2020, then took two unscheduled personal days on Wednesday, November 4, 2020 and Thursday, November 5, 2020 due to mental health issues, and was already scheduled to be off due to his Equitrans 9/80 scheduled on Friday, November 6, 2020.

79.    Further, the Defendant later acknowledged that the Plaintiff did reach out to the Defendant on Friday, November 6, 2020, a day that he was otherwise scheduled to be off of work.

80.    As mentioned above, as a result of the retaliatory actions the Plaintiff was forced to endure, on or about April 14, 2021, the Plaintiff filed an Amendment to his Charge to include Retaliation by the Defendant.

81.    In that filing, the Plaintiff made note of the anti-Asian segment that had presented itself during this COVID pandemic, and how specific information regarding separation between racial minorities and women could be found in the Defendant's Annual Corporate Social Responsibility Report.

82.    Further noting that only 23% of the workforce of the Defendant is either a racial minority or a woman, despite the fact that those numbers are much higher in the general population.

83.    It is important to reassert that two of the last three terminations that occurred in the design engineering department have been minorities, and most notably involuntarily terminated was Deniz Karacay, a minority Engineer II, and Carlos Caminos, a minority Sr. CAD Designer.

84.     Additional proof of the disparities within the Defendant company, is seen with the treatment of the four gas pipeline engineers currently within the department, two are ethnic minorities and two are white.

85.     The Plaintiff and the other ethnic minority engineer were classified as Engineer I (after Plaintiff's complaint, the other ethnic minority was promoted to engineer II in February of 2021).

86.     Despite the Plaintiff having the most oil and gas industry experience in the group, he has been classified as engineer I, while a white engineer named Dan Uniatowski, with less oil and gas industry experience than either the Plaintiff or the other minority, and yet is designated a level III, two grades above the Plaintiff.

87.     It is the Plaintiff's position that the Defendant's process has not been uniformly applied throughout the engineering department the Plaintiff works in, and he has been discriminated against.

88.     The Plaintiff has been ostracized, omitted, and treated inconsistently with regard to past practices within that department, treated differently than white employees, and retaliated against for complaining.

89.     The Plaintiff received a Dismissal and Notice of Rights dated August 13, 2021, which noted that the EEOC would not be proceeding any further. (Exhibit 1)

## **Count 1: Race Discrimination: Title VII of the Civil Rights Act and PHRA**

90.     Plaintiff incorporates all the previous paragraphs by reference as if fully set forth herein.

91.     The Defendant expressed discriminatory animus and committed discriminatory acts against the Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1) and the Pennsylvania Human Relations Act (PHRA).

92.     The Plaintiff has been ostracized, omitted, and treated inconsistently with regard to past practices and treated differently than white employees.

93.     The Plaintiff was very clearly and unjustifiably discriminated against, as he is aware of white employees not receiving anywhere to the same level of scrutiny or discipline.

94.     The Plaintiff was denied work assignments and promotions, though he had more industry experience than any other engineer I within the company, the less experienced white engineers were favored.

95.     The Defendant's actions were done with malice or reckless disregard of Plaintiff's federally protected rights.

WHEREFORE, the Plaintiff respectfully requests this Court enter judgment in his favor and against the Defendant, and award him damages for past lost wages and benefits, future lost wages and benefits, compensatory damages for humiliation, embarrassment and inconvenience, loss of standing and reputation in his community and place of business, punitive damages, declaratory and injunctive relief, attorney's fees and costs, adverse tax consequences, and such other relief as the Court may deem appropriate.

A jury trial is demanded.

## Count 2: Retaliation: Title VII and PHRA

96.     Plaintiff incorporates all the previous paragraphs by reference as if fully set forth herein.

97.     The chronology of events in this matter demonstrates clear evidence that the conduct of the Defendant was undeniably done in retaliation for prior complaints and actions filed by the Plaintiff, which have drawn attention and focus to the discriminatory acts of the Defendant.

98.     As a result, Plaintiff was harassed, humiliated, and discriminated against by the Defendant in retaliation for the assertion of his rights under the Title VII and the PHRA.

99.     The Defendant fabricated multiple allegations in a number of categories within the Plaintiff's annual review after the initial EEOC Charge filing, which was by far the most critical review he received, drastically different from prior reviews, and was not accurate to the actual performance of the Plaintiff.

100.     Defendant's conduct in retaliation for Plaintiff's complaints constitutes unlawful retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C.A. Section 2000e-, and PHRA.

WHEREFORE, the Plaintiff respectfully requests this Court enter judgment in his favor and against the Defendant, and award him damages for past lost wages and benefits, future lost wages and benefits, compensatory damages for humiliation, embarrassment and inconvenience, loss of standing and reputation in his community and place of business, punitive damages, declaratory and injunctive relief, attorney's fees and costs, adverse tax consequences, and such other relief as the Court may deem appropriate.

A jury trial is demanded.

## Count 3: Hostile Work Environment

101.     Plaintiff incorporates all the previous paragraphs by reference as if fully set forth herein.

102.    Plaintiff has repeatedly endured acts of discrimination and retaliation from the Defendant, including being ostracized, omitted, and treated inconsistently with regard to past practices, treated differently than white employees, and retaliated against for complaining. The Defendant created a hostile work environment for the Plaintiff by discriminating against him.

103.    The Defendant created a hostile work environment for the Plaintiff by retaliating against him for asserting his rights under the Title VII and the PHRA.

104.    The Plaintiff's superiors and agents of the Defendant have increasingly responded to him in a manner that was intensely hostile, with behavior that was both verbally and physically threatening.

105.    As a direct and proximate result of Defendant's actions, the Plaintiff has suffered and continues to suffer, lost wages and benefits, lost employment opportunities and future income, as well as humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, the Plaintiff respectfully requests this Court enter judgment in his favor and against the Defendant, and award him damages for past lost wages and benefits, future lost wages and benefits, compensatory damages for humiliation, embarrassment and inconvenience, loss of standing and reputation in his community and place of business, punitive damages, declaratory and injunctive relief, attorney's fees and costs, adverse tax consequences, and such other relief as the Court may deem appropriate.

A jury trial is demanded.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

A)      Grant a permanent injunction enjoining Defendant, its directors, officers, employees, agents, successors, heirs and assigns, and all persons in active concert and participation with them, from engaging in, ratifying, or refusing to correct, employment practices which interfere with the exercise of rights and/or discriminate in violation of Title VII of the Civil Rights Act and PHRA;

B)      Order Defendant to institute and implement training programs, policies, and practices and programs designed to ensure the Defendant provide proper leave and does not retaliate and/or interfere with those who engage in statutorily protected activity;

C)      Order Defendant to make whole Trung De Sa, by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, compensate him for lost benefits, and all other affirmative legal and equitable relief necessary to eradicate the effects of its unlawful employment practice;

D)      Order Defendant to pay Plaintiff compensatory damages in an amount to be determined at trial;

E)      Order Defendant to pay Plaintiff the reasonable attorney's fees and costs and other legal expenses incurred by the Plaintiff in this matter;

F)      Order Defendant to remove and expunge, or to cause to be removed or expunged, all negative, discriminatory, and/or defamatory memorandum or other documentation from the Plaintiff's record of employment; and

G)      Award the Plaintiff such other legal and equitable relief as the Court deems

appropriate and just.

**A JURY TRIAL IS DEMANDED AS TO ALL ISSUES TRIABLE TO A JURY.**

                                    Respectfully submitted,

                                    /s/ Sean A. Casey
                                    Sean A. Casey
                                    PA ID #79806
                                    Email: sean@caseylegal.com

                                    **SEAN A. CASEY, ATTORNEY AT LAW**
                                    First & Market Building
                                    100 First Avenue, Suite 1010
                                    Pittsburgh, PA 15222
                                    T: (412) 201-9090
                                    F: (412) 281-8481